IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**WEST VIRGINIA HIGHLANDS
CONSERVANCY, INC., and
WEST VIRGINIA RIVERS COALITION,**

        **Plaintiffs,**

**v.**                **//   CIVIL ACTION NO. 1:07CV87
                                  (Judge Keeley)**

**RANDY HUFFMAN, Secretary,
West Virginia Department of
Environmental Protection,**

        **Defendant.**

<u>**MEMORANDUM OPINION AND ORDER**</u>

Pending before the Court is the motion of the plaintiffs, West Virginia Highlands Conservancy and West Virginia Rivers Coalition ("Highlands Conservancy"), for summary judgment and prospective injunctive relief. Because this civil action arises under the Clean Water Act, 33 U.S.C. 1251, <u>et</u> <u>seq.</u>, ("CWA" or "the Act"), the Court has original jurisdiction pursuant to 28 U.S.C. § 1331.

This case involves claims that the West Virginia Department of Environmental Protection ("WVDEP") is violating federal environmental laws by emitting pollutants into West Virginia waterways without a permit. For the reasons that follow, the Court **GRANTS** the plaintiffs' motion for summary judgment, finds that the WVDEP is violating the CWA, 33 U.S.C. §§ 1311(a) and 1342, by emitting pollutants into navigable waterways of the United States from a point source without a permit, and **ORDERS** the WVDEP to apply

for and obtain National Pollution Discharge Elimination System ("NPDES") permits for discharges from the eighteen (18) sites at issue in this case.

## I. STANDARD OF REVIEW

A moving party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, a court must review the evidence "in the light most favorable to the nonmoving party." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of establishing the basis for the motion and the nonexistence of genuine issues of fact. Id. at 323. Once that burden has been met, "the opponent must do more than simply show that there is some metaphysical doubt as to material facts" by presenting specific facts showing the existence of a genuine issue for trial. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus,

summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita, 475 U.S. at 587.

## II.  PROCEDURAL BACKGROUND

On June 29, 2007, the Highlands Conservancy initiated this citizen suit pursuant to Section 505 of the CWA, 33 U.S.C. § 1365. Its Complaint alleges that the defendant, Randy Huffman ("Huffman"), as Secretary of the WVDEP, is releasing pollutants into West Virginia streams from "point source discharges" at reclaimed surface mine sites without an NPDES permit as required by the CWA, 33 U.S.C. § 1342.  The Highlands Conservancy seeks both a judgment declaring that the WVDEP is violating the CWA, and also injunctive relief requiring the WVDEP to apply for and obtain NPDES permits for pollution discharges from eighteen sites in the Northern District of West Virginia within six months of any final order of this Court.  It further seeks an order requiring the WVDEP to provide it with monthly status reports and to notify it and the Court when the permits issue.

## III.  LEGISLATIVE FRAMEWORK

### A.  The Clean Water Act

Congress enacted the CWA in 1948 with the goal of "restor[ing] and maintain[ing] the chemical, physical, and biological integrity

of the Nation's waters." 33 U.S.C. § 1251(a). It intended that the CWA "recognize, preserve and protect the primary responsibilities and rights of the States to prevent, reduce and eliminate pollution," but charged the Administrator of the Environmental Protection Agency with administering the Act. Id. at § 1251(b)&(d).

To achieve its goals of eliminating water pollution, the CWA provides that "the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a). The term "person" includes not only individuals and corporations, but also the several states and their political subdivisions. Id. at § 1362(5). The "discharge of any pollutant" refers to "any addition of any pollutant to navigable waters from any point source." Id. at § 1362(12). Among many other things, "pollutants" include chemical wastes, biological materials and industrial waste. Id. at § 1362(6). "Navigable waters" are the waters of the United States. Id. at § 1362(7). A "point source" is "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged." Id. at § 1362(14). Point sources include such conveyances as pipes, ditches, channels, tunnels, conduits and containers. Id.

As an exception to the CWA's stringent prohibition on the discharge of pollutants, the Act authorizes the Administrator of

the EPA to issue NPDES permits, which allow limited discharges of certain pollutants.  The Act states that, with certain exceptions not applicable here, "the [EPA] Administrator may, after opportunity for public hearing, issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 1311(a) of this title," upon certain conditions.  33 U.S.C. § 1342.

Although the EPA is charged with administering the NPDES permit program, any state wishing to issue its own NPDES permits may submit a plan for approval to the Administrator.  33 U.S.C. § 1342(b).  Following approval, however, the Administrator retains oversight of the permitting process and the state must transmit to the EPA copies of every permit application it receives, as well as notification of every action it intends to take, including when it intends to issue a permit.  Id. at § 1342(d).  The EPA then has 90 days to object to the issuance of the permit.  Id.  The EPA has approved the WVDEP to issue such permits in West Virginia, and the WVDEP does so regularly.

**B.  West Virginia's Surface Mining Reclamation Law**

Pursuant to the federal Surface Mining Control Reclamation Act ("SMCRA") of 1977, 30 U.S.C. § 1201, et seq., the WVDEP has assumed control of certain former surface coal mining operations, called

"bond forfeiture sites." SMCRA was enacted to protect the public and the environment from adverse effects of coal mining. <u>Id.</u> at § 1201. It established a program of "cooperative federalism" that allows states to enact and administer their own regulatory programs in accordance with "national minimum standards." <u>Bragg v. West Virginia Coal Assoc.</u>, 248 F.3d 275, 288 (4th Cir. 2001).

Under this program of "cooperative federalism," the federal government grants exclusive regulatory jurisdiction to states that enact their own regulations incorporating SMCRA's minimum standards. <u>Id.</u> While the Office of Surface Mining Reclamation and Enforcement ("OSM"), within the United States Department of the Interior, approves and oversees these state programs, state officials administer the programs.

The OSM may withdraw federal approval of an ineffectively enforced state program. Should that occur, or should a state fail to enact or gain approval for its own program, the federal program becomes the applicable law and the Secretary of the Interior, through the OSM, retains exclusive jurisdiction over the regulation and control of surface mining activities in the state. <u>Id.</u> at 289.

In West Virginia, the OSM has approved legislation enacted pursuant to SMCRA (hereinafter "West Virginia's SMCRA") and the WVDEP has promulgated regulations implementing that law. <u>See</u> 30

6

C.F.R. Parts 948.10 and 948.15; W. Va. Code § 22-3-1, <u>et</u> <u>seq.</u>
Therefore, West Virginia currently retains exclusive jurisdiction
over the regulation of surface mining within its borders.  <u>Bragg</u>,
248 F.3d at 289.

Among other things, in accordance with federal requirements,
West Virginia's SMCRA provides that no person may extract coal by
surface mining without a permit.  <u>See</u> 30 U.S.C. § 1259; W. Va. Code
§ 22-3-11.  Before a surface mine permit may issue, the mine
company must file a "performance bond" with the state in an amount
sufficient to ensure completion of reclamation should the bond be
forfeited and the regulatory agency called upon to complete the
reclamation.  <u>Id.</u>  <u>See also</u>, <u>West Virginia Highlands Conservancy v.</u>
<u>Norton</u>, 137 F. Supp. 2d 687, 693 (S.D.W. Va. 2001).  Additionally,
in the event that the bonds do not cover the full cost of
reclamation, coal operators pay into a Special Reclamation Fund
("SRF") which supplements the site-specific performance bonds.
W. Va. Code §§ 22-3-11 and 22-3-11(a); <u>Norton</u>, 137 F. Supp. 2d at
693.  <u>See</u> <u>also</u> Pl's Ex. 3, Depo. of Ken Ellison p. 29-30.

When a mining company forfeits a bond, the proceeds of that
bond are used to complete reclamation of the abandoned mine site.
38 CSR 2-12.4.b.  Although regulations promulgated pursuant to West
Virginia's SMCRA provide that "the operator or permittee shall be

liable for all costs in excess of the amount forfeited," id. at 2-12.4.e, they also state that

> where the proceeds of the bond forfeiture are less than
> the actual cost of reclamation, the Secretary [of the
> DEP] shall make expenditures from the special reclamation
> fund to complete reclamation.  The Secretary shall take
> the most effective actions possible to remediate acid
> mine drainage, including chemical treatment where
> appropriate, with the resources available.

Id. at 2-12.14.d.   In State ex rel. West Virginia Highlands Conservancy, Inc. v. West Virginia Department of Environmental Protection, 447 S.E.2d 920, 925 (1994), the West Virginia Supreme Court of Appeals confirmed the WVDEP's duty to use the SRF to complete reclamation.

Also under West Virginia's SMCRA regulations, the Secretary of the WVDEP must establish an inventory of all sites where companies have forfeited their bonds and prioritize those sites based upon several factors, including the severity of the discharge and the quality of the receiving stream.   38 C.S.R. § 2-12.5.b.   The Secretary shall then "select from the priority listing such sites for the application of amelioration techniques to achieve water quality enhancement and to minimize long-term disturbance to the hydrologic balance." Id. at § 2-12.5.c.

In selecting sites for water quality improvements, the Secretary shall determine the appropriate treatment techniques and

"the selection process shall take into consideration the relative benefits and costs of the projects." Id. at § 2-12.5.d.  Among other things, completion of reclamation requires long term planning to ensure compliance with effluent limitations promulgated by the EPA and water quality standards set by the state.  Id. at §§ 2-12.4.b and 2-12.5.e.

## IV.  FACTUAL HISTORY

In the context of this comprehensive legislative framework, the dispute in this case centers on eighteen bond forfeiture sites in the northern part of West Virginia that currently are under the control of the WVDEP.  At each of these sites, the WVDEP treats and releases acid mine drainage ("AMD") into streams.  In early 2007, the Highlands Conservancy requested data from the WVDEP on the water quality of the streams at these sites.  That data revealed that the levels of AMD being discharged into these streams exceed the water-quality based effluent standards for pH, iron, manganese and aluminum, as promulgated by the EPA pursuant to the CWA; indeed, at times, these levels also exceed the technology-based effluent limitations established by the EPA for reclamation bond sites.  See Stipulation ("Stip.") (dkt. no. 25), Table A.  Despite this, and despite the fact that it is the entity charged with

**MEMORANDUM OPINION AND ORDER**

issuing NPDES permits in West Virginia, the WVDEP has not issued itself permits for any of these sites.

Huffman concedes that the levels of pollutants his agency is discharging from these sites would not meet the effluent standards required by an NPDES permit. Pl's Ex. 3, p. 29-31. He also agrees that the pollutants are being discharged into "navigable waters" under the CWA, stip. ¶¶ 4, 5, & 6, and that the "outfalls" from the eighteen sites "each have the physical characteristics of a point source" as defined by the CWA. Pl's Ex. 3, p. 23. Nevertheless, he disputes whether, as a matter of law, these bond forfeiture sites should be considered point sources. He acknowledges, however, that the prior private operators of these sites were required to obtain NPDES permits, stip. ¶ 9, and that the WVDEP actually issued NPDES permits to the former mine operators for discharges from each of these sites. Id.

The parties also stipulate that, in April 2005, the WVDEP actually issued itself an NPDES permit for a reclamation project at one of the sites at issue in this case, the so-called "Alton Project."[1] Stip. ¶ 11; Pl.'s Ex. 2, WVDEP NPDES permit for "Alton

---

[1]     Of the eighteen sites at issue in this case, this site, the "Alton project," is the only one actually owned by the WVDEP. See Def's Reply Brief, p. 9, n. 2. "The real property at the DLM site was transferred to the WVDEP's predecessor agency in 1986 in

Project."  The reason for issuance of the permit began in 1986, when, in response to a suit brought by the Highlands Conservancy, the regional EPA office sent two letters to the predecessor agencies of the WVDEP, the West Virginia Department of Energy ("WVDOE"), and the West Virginia Department of Natural Resources ("WVDNR").  Stip. ¶ 11; Pl's Ex. 4, Letters from EPA.  In those letters, the EPA noted that the WVDOE was operating a treatment facility at the former DLM coal mine near Alton in Upshur County, West Virginia, in order to complete reclamation at that site, and directed the agency to obtain an NPDES permit for its discharges. Id.  In compliance with EPA's directive, the WVDEP issued itself an NPDES permit to "discharge treated water from the Alton Project" into nearby waters of the United States.[2]  Pl.'s Ex. 2.

## V.  LEGAL ANALYSIS

The dispute in this case highlights a tension between federal law, the CWA, and state law, West Virginia's SMCRA.  The WVDEP is currently treating and releasing AMD from bond forfeiture sites into West Virginia's streams pursuant to a regulatory program

---

an agreement with DLM in which WVDEP assumed responsibility for the water treatment at the site."  Id.

[2]     The Court is unable to determine why such a long delay occurred in the issuance of the permit.

11

designed in accordance with West Virginia's SMCRA and approved by the OSM. Although it is apparently complying with West Virginia's SMCRA, the WVDEP does not contest that it is also releasing levels of pollutants into navigable waters of the United States that would not meet the stricter effluent limitations required under the CWA's permitting program. Accordingly, if ordered to obtain an NPDES permit, the WVDEP would be required to achieve higher water quality standards at its bond forfeiture sites than is required under SMCRA, the law requiring state reclamation of these sites in the first place.

The Highlands Conservancy argues that the plain language of the CWA compels a finding that the WVDEP is violating that Act, because the WVDEP is a "person" discharging pollutants from point sources into the navigable waters of the United States without an NPDES permit. Moreover, it contends that the CWA contains no statutory exemption from the NPDES permitting requirements for activities engaged in by the WVDEP pursuant to its regulatory responsibilities under SMCRA. See Comm. To Save Mokelumne River v. East Bay Mun. Util. Dist., 13 F.3d 305, 309 (9th Cir. 1993) (holding that only express statutory exemptions could relieve state governmental liability for actions taken pursuant to state regulations, and that the CWA contains no such exemptions).

**MEMORANDUM OPINION AND ORDER**

Finally, it argues that, under the Supremacy Clause of the United States Constitution, any federal requirements created by the CWA trump conflicting state requirements contained in West Virginia's SMCRA and its accompanying regulations.

On behalf of the WVDEP, Huffman contends that, in the past, the EPA has not objected to the WVDEP's regulatory program, and that requiring the WVDEP now to obtain and meet the more stringent requirements of an NPDES permit is impractical and would work a serious financial hardship on West Virginia.  By way of illustrating those hardships, he points to the fact that many of the bond forfeiture sites are in remote locations, lack electricity and are difficult to access in bad conditions; consequently, the technology available to treat discharges at these sites is limited, as well as extremely expensive to procure.  Pl. Ex. 3 p. 31-33; Oral Argument, October 28, 2008.

In further support of his contention that this Court should deny the Highland Conservancy's summary judgment motion, Huffman asserts that the doctrine of sovereign immunity bars the Highlands Conservancy's suit.  Alternatively, he argues that the "outfalls" at the bond forfeiture sites should not be considered "point sources" because the EPA has not treated them as such in other circumstances.  Finally, he asserts that the WVDEP's unique status

as a "caretaker" of the bond forfeiture sites excludes it from being considered an "operator" of the site required to obtain an NPDES permit. The Court now turns to each of these arguments.

## A. Sovereign Immunity

According to Huffman, the doctrine of sovereign immunity bars the Highlands Conservancy from suing the WVDEP under the CWA. The Eleventh Amendment provides the several states with immunity from suits by private individuals in federal court.[3] It is well-established, however, that it does not preclude private individuals from suing state officials for prospective injunctive relief designed to remedy an on-going violation of federal law. <u>E.g.</u>, <u>South Carolina Wildlife Fed'n v. Limehouse</u>, 549 F.3d 324, 332 (4th Cir. 2008).

This exception to the doctrine of sovereign immunity was first enunciated by the United States Supreme Court in <u>Ex parte Young</u>, 209 U.S. 123 (1908). More recently, in <u>Frew ex rel. Frew v. Hawkins</u>, 540 U.S. 431, 437 (2004), the Supreme Court explained:

> The Eleventh Amendment confirms the sovereign status of the States by shielding them from suits by individuals

---

[3] "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commended or prosecuted again one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.

> absent their consent. To ensure the enforcement of
> federal law, however, the Eleventh Amendment permits
> suits for prospective injunctive relief against state
> officials acting in violation of federal law. This
> standard allows courts to order prospective relief, as
> well as measures ancillary to appropriate prospective
> relief. Federal courts may not award retrospective
> relief, for instance, money damages or its equivalent, if
> the State invokes its immunity.

(internal citations omitted). Importantly, such suits may only

seek prospective injunctive relief against state officials for

violations of <u>federal law</u>, and cannot be based on alleged

violations of <u>state law</u>. <u>Bragg</u>, 248 F.3d at 293.

In this case, the Highlands Conservancy has sued Huffman, a

state official, to obtain prospective injunctive relief for alleged

on-going violations of federal law, the CWA's permitting

requirements. Huffman argues that, because the EPA has authorized

the WVDEP to issue NPDES permits, the WVDEP should be considered

the "primary regulator" of such permits in West Virginia.

Accordingly to Huffman, once that principle is established, it

follows that, at bottom, this is a suit to force the WVDEP to

comply with state laws relating to the issuance of NPDES permits,

not the federal CWA's requirements.

Huffman relies heavily on the Fourth Circuit's holding in

<u>Bragg</u> that the Eleventh Amendment precludes suits against state

officials under SMCRA. 248 F.3d at 286. In <u>Bragg</u>, after

thoroughly analyzing the text of SMCRA, the Fourth Circuit found that, "in contrast to other 'cooperative federalism' statutes, SMCRA exhibits extraordinary deference to the States." <u>Id.</u> at 293. Specifically, once a state promulgates laws and implements regulations under SMCRA, that state obtains exclusive regulatory jurisdiction of those laws and regulations, and the federal government is "conditionally divested" of any direct regulatory authority. <u>Id.</u> at 294. Accordingly, a suit seeking to enforce state-implemented SMCRA laws and regulations would be a suit to enforce state, not federal, law, and therefore would not fall within <u>Ex parte Young</u>'s exception. <u>Id.</u> at 297-98.

Unlike SMCRA, the CWA specifically preserves the EPA's enforcement authority: "Nothing in this section shall be construed to limit the Authority of the Administrator [of the EPA] to take action pursuant to section 1319 if this title." 33 U.S.C. § 1342(I). Section 1319 grants enforcement authority to the EPA for violations of § 1311 (and other sections), including situations in which "violations appear to result from a failure of the State to enforce such permit conditions or limitations effectively." 33 U.S.C. § 1319(a)(2). Accordingly, the CWA clearly preserves a federal enforcement mechanism, and does not grant exclusive, albeit conditional, regulatory authority to the states.

The Fourth Circuit acknowledged as much in <u>Bragg</u>. While concluding that Eleventh Amendment sovereign immunity precludes suits against states for violations of state laws and regulations passed pursuant to SMCRA, the court made note of the fact that "the statutory federalism of SMCRA is quite unlike the cooperative regime under the Clean Water Act." 248 F.3d at 294 (<u>citing Arkansas v. Oklahoma</u>, 503 U.S. 91 (1992)).[4]

Although he argues that the language of the CWA grants exclusive regulatory authority to states that have obtained EPA authorization to issue NPDES permits, Huffman cites no supporting authority. Nor has he cited to any decision holding that sovereign immunity bars citizen suits for prospective injunctive relief against state officials who allegedly violate the CWA.[5]

_____

[4]     As Huffman correctly points out, <u>Arkansas v. Oklahoma</u> arose as a suit between states over a federally-issued NPDES permit and, thus, addressed a different provision of the CWA than the one at issue here. Nevertheless, in discussing the CWA generally, the Supreme Court recognized that "the Clean Water Act anticipates a partnership between the States and the Federal Government," and that the EPA retains continuing regulatory authority over state NPDES permitting programs. <u>Arkansas v. Oklahoma</u>, 503 U.S. at 101.

[5]     Although Huffman urges this Court to look to the legislative history of the CWA for guidance, there is no ambiguity in the plain meaning of the CWA, and therefore no need to look beyond that statute's text. <u>See</u> <u>U.S. v. Gonzales</u>, 520 U.S. 1, 6 (1997) ("Given the straightforward statutory command, there is no reason to resort to legislative history.")

Indeed, as the Highlands Conservancy argues, the cases that have addressed the issue of sovereign immunity in this context have held that the Eleventh Amendment does not bar citizen suits under the CWA for prospective injunctive relief against state officials for violations of state-issued NPDES permits.  For example, <u>Swartz v. Beach</u>, 229 F. Supp. 2d 1239, 1253-55 (D. Wyo. 2002), held that the Eleventh Amendment did not bar a land owner from suing the Wyoming Department of Environmental Quality for failing to enforce an NPDES permit it had issued to a private corporation, to the extent that the landowner sought prospective injunctive relief.

In <u>Committee to Save Mokelumne River v. East Bay Municipal Utility District</u>, 37 ERC 1159, 1160-61 (E.D. Cal. March 2, 1993), a case on which the Highlands Conservancy relies heavily, a citizen group sued state entities in California that were discharging pollutants from an abandoned mine facility without an NPDES permit. As in this case, the EPA had delegated the authority to issue NPDES permits to the State of California.  <u>Id.</u> at 1163.  The district court granted summary judgment to the citizen group, however, finding that the state entities had violated the CWA by failing to obtain an NPDES permit for the discharges.  <u>Id.</u> at 1176.  The Ninth Circuit upheld the district court's decision, explicitly holding that the Eleventh Amendment did not bar the citizen group from

suing the state entities for prospective equitable relief. Mokelumne River, 13 F.3d at 309-10.

Similarly, in Froebel v. Meyer, 13 F. Supp. 2d 843, 845 (E.D. Wis. 1998), the plaintiffs sued two officials of the Wisconsin Department of Natural Resources for discharging pollutants into several bodies of water without NPDES permits. As it had done in Wyoming and California, the EPA had granted Wisconsin authority to issue its own NPDES permits. Id. at 855. After thoroughly considering the doctrine of Eleventh Amendment sovereign immunity, the district court rejected "the suggestion that state permitting authority divests federal courts of jurisdiction to hear citizen suit complaints alleging CWA violations by state officials." Id. It too concluded that the Eleventh Amendment does not bar citizen suits against state officials seeking prospective injunctive relief for claims arising under the CWA. Id.

These cases support the conclusion that the system of cooperative federalism created by the CWA's NPDES permitting provisions does not divest the federal government of regulatory authority. A citizen suit alleging a violation of the CWA for failure to obtain an NPDES permit, therefore, pleads a violation of federal, not state, law. Accordingly, when brought against state officials to obtain prospective injunctive relief, suits such as

this do not run afoul of the Eleventh Amendment or infringe a state's sovereign immunity.

### B. Point Sources

Turning to the merits of the Highlands Conservancy's claims, Huffman argues next that the bond forfeiture sites should not be characterized as "point sources," and that the WVDEP should not be required to obtain NPDES permits.  While admitting that the pipes, ditches and channels from which the pollutants are discharged at these sites have the physical characteristics of "point sources," he nevertheless contends that, in other contexts, the EPA itself does not treat AMD discharge from bond forfeiture sites as "point sources."  In support of his argument, Huffman identifies several scenarios where the EPA has "tacitly" approved of pollution treatment plans in which bond forfeiture sites are not considered point sources.

### 1. Total Maximum Daily Load Models

The first scenario involves action plans called Total Maximum Daily Load ("TMDL"), which the WVDEP uses to clean up streams considered to be "impaired" because they do not meet certain water quality standards required by the CWA.  West Virginia Department of Environmental Protection, Division of Water and Waste Management, Total Maximum Daily Load, http://www.wvdep.org/item.cfm?ssid=

11&sslid=930 (last visited January 2, 2009).  Once a stream has been identified as impaired, the WVDEP develops a TMDL for that stream.[6]  Id.

Without documentation, Huffman asserts that both the WVDEP and the EPA have developed TMDL models that take into consideration AMD discharges from sources with NPDES permits, as well as from "unpermitted" sources.  He contends that in those models the EPA treats bond forfeiture sites in a manner that is identical to its treatment of abandoned mine lands – those surface mines abandoned before SMCRA required that a bond be posted – and considers both to be "uncontrolled" or "unpermitted" discharge sites.  According to Huffman, the WVDEP considers the discharges from both bond forfeiture sites and abandoned mine land sites to be non-point source discharges.  He argues that, because the EPA is aware of the WVDEP's practices in developing these models and has not provided contrary guidance, it has "tacitly" approved the WVDEP's interpretation, and, moreover, has made a nearly identical categorization of such sources in its own TMDL approach.

To further advance his argument, Huffman relies on a plan developed by the Pennsylvania Department of Environmental

───────────

[6]     The WVDEP in fact has developed TMDLs for several of the streams implicated in this case.  Stip. ¶ 7.

Protection ("PADEP"), in which the PADEP, using a TMDL approach, treats both abandoned mine lands and bond forfeiture sites in a similarly comprehensive manner.  According to Huffman, the PADEP contacted its regional EPA office seeking feedback on its plan, and the EPA responded in a letter expressing approval of the plan and noting the agencies' shared concern over the "effective utilization of limited resources."  Pl's Ex. (dkt. no. 36), Nov. 7, 2001 EPA Region III letter to PADEP, p. 1.

Notably, although approving the PADEP plan, the EPA specifically refused to make an independent determination that those discharges were exempt from NPDES permitting requirements. Id. at 2.  Indeed, it went out of its way to correct the PADEP's mistaken understanding that the EPA treats AMD discharges from bond forfeiture sites as non-point sources:

> We acknowledge that some acid mine drainage TMDLs address abandoned and reclaimed mine lands as non-point sources for modeling purposes.  This is because there are no current National Pollutant Discharge Elimination System (NPDES) permits associated with these areas.  As such, the discharges associated with these land uses were assigned load allocations.  In each instance, EPA has noted that the decision to assign load allocations to abandoned and reclaimed mine lands does not reflect any determination by EPA as to whether there are unpermitted point source discharges within these land uses.  Nor does it reflect a determination by EPA that these discharges are exempt from NPDES permitting requirements.

Id. (emphasis added). Thus, while the EPA may approve of, and even be involved in, designating bond forfeiture sites as "unpermitted" discharges for purposes of TMDL modeling, it clearly has not exempted these sites from consideration as point sources for NPDES permitting purposes. See id.

Moreover, even if the EPA intended to exclude bond forfeiture sites from being categorized as "point sources," and to exempt them from NPDES permitting requirements, such an exclusion is not sanctioned by the CWA and would be unenforceable. In NRDC v. Costle, 568 F.2d 1369, 1375 (D.C. Cir. 1977), the Court of Appeals for the District of Columbia Circuit stated that the EPA does not have "discretion to exempt large classes of point sources from any or all requirements of the [CWA]." Under review in that case were regulations promulgated by the EPA in 1973 exempting several classes of point sources from the requirement of obtaining NPDES permits. The rationale behind the exemption was that the EPA wanted to conserve the Agency's scarce enforcement resources for more significant point sources of pollution. Id. at 1373. The Court of Appeals rejected that reasoning, holding that "the wording of the statute, legislative history, and precedents are clear: The EPA Administrator does not have authority to exempt categories of point sources from the permit requirements of § 402." Id. at 1377.

Similarly, in <u>Northern Plains Resource Council v. Fidelity</u> <u>Exploration and Development Co.</u>, 325 F.3d 1155, 1164 (9th Cir. 2003), the Ninth Circuit held that "the EPA does not have the authority to exempt discharges otherwise subject to the CWA.  Only Congress may amend the CWA to create exemptions from regulation." The defendant in <u>Northern Plains</u> was discharging pollution without an NPDES permit, and the Montana state permitting authority concluded that Montana law did not require a permit for the type of pollution being discharged.  <u>Id.</u> at 1159.  The district court agreed, finding that "the EPA implicitly approved of Montana's groundwater exemption because the EPA did not revoke Montana's authority to operate the EPA-approved state permitting program . . . ."  <u>Id.</u> at 1164.  "Giving deference" to the EPA's "approval" of Montana's exemption, it concluded that the defendant did not need a permit.  <u>Id.</u>

The Ninth Circuit reversed, holding that the EPA lacks authority to exempt discharges and could not lawfully approve the Montana state exemption.  <u>Id.</u>  It further noted that Montana lacked authority to exempt discharges otherwise subject to the NPDES permitting process, because "it cannot possibly be urged that Montana state law in itself can contradict or limit the scope of

the CWA, for that would run squarely afoul of our Constitution's Supremacy Clause." Id. at 1165.

The argument Huffman has advanced here is the same argument rejected by both the Ninth and D.C. Circuits. There simply is no sound legal support for his contention that "tacit" approval by the EPA of the WVDEP's TMDL programs and regulations promulgated pursuant to West Virginia's SMCRA creates an exception to the CWA's NPDES permit requirements for bond forfeiture sites. Even had the EPA intended to create such an exemption, as Costle decided, "[t]he EPA Administrator does not have authority to exempt categories of point sources from the permit requirements of § 402." 568 F.2d at 1377.

### 2. The OSM's Tennessee Reclamation Program

Huffman next argues that, because OSM approved West Virginia's SMCRA and the WVDEP's programs implementing it, despite that agency's failure to obtain NPDES permits, regulatory authorities should not be expected to obtain such permits. For support, he points to Tennessee, where the OSM has assumed jurisdiction over that state's special reclamation program without obtaining NPDES permits for discharges from its bond forfeiture sites. See 72 Fed. Reg. 9616, 9629 (March 2, 2007). When OSM responded to public comments concerning a set of rules it promulgated regarding its

25

takeover of Tennessee's regulatory program, it specifically stated that, in assuming authority over a bond forfeiture site under SMCRA, it did not become the permittee, nor did it "assume the permittee's NPDES compliance duties."  <u>Id.</u>

In reaching this conclusion, however, the OSM addressed only its obligations under SMCRA as a regulatory authority that had assumed reclamation duties for a bond forfeiture site.  <u>Id.</u>  Thus, its statement was limited to its consideration of the extent of its responsibilities under SMCRA and the rules interpreting SMCRA.  In fact, OSM has made clear on several occasions that it was not addressing the requirements of the CWA.  <u>Id.</u>  For example, in responding to comments on a rule regarding special consideration for bond forfeiture sites with long-term post-mining pollution discharges, 30 C.F.R. § 942.800(c), it stated:

> [I]n keeping with section 702(a) of SMCRA, 30 U.S.C.
> 1292(a), <u>we have no authority to modify discharge
> treatment standards established under the authority of
> the CWA or its implementing regulations.</u> Issuance of a
> National Pollutant Discharge Elimination System (NPDES)
> permit for point-source discharges and establishment of
> effluent    limits    for    those    discharges    is    the
> responsibility of the agency charged with administering
> the CWA in Tennessee.

72 Fed. Reg. at 9627 (emphasis added).  Thus, the OSM has explicitly acknowledged that its limited authority does not extend to interpreting the CWA.  Therefore, any reliance by Huffman on

**MEMORANDUM OPINION AND ORDER**

actions of OSM to interpret the CWA's permitting requirements is misplaced.

### C.   Persons Required to Obtain NPDES Permits

Huffman further argues that, although the WVDEP manages and controls the release of AMD from bond forfeiture sites into the waters of the United States, it should not be required to obtain an NPDES permit because, pursuant to West Virginia's SMCRA and its implementing regulations, the WVDEP is the caretaker of the bond forfeiture sites, not their owner or operator.

Under the regulations establishing the NPDES permitting system, however,

> any person who discharges or proposes to discharge pollutants . . . and who does not have an effective permit . . . must submit a complete application to the Director in accordance with this section and part 124 of this chapter.

40 C.F.R. § 122.21(a).  Like the CWA itself, these regulations define "person" as "an individual, association, partnership, corporation, municipality, <u>State or Federal agency, or an agent or employee thereof</u>."   40 C.F.R. § 122.2 (emphasis added). Accordingly, a state agency or its employee discharging pollutants without an effective permit must apply for an NPDES permit.

The regulation then clarifies that "[w]hen a facility or activity is owned by one person but is operated by another person,

27

it is the operator's duty to obtain a permit." 40 C.F.R. § 122.21(b). Here, the parties agree that the WVDEP owns only one of the eighteen bond forfeiture sites at issue, the DLM Coal Co. site in Alton, West Virginia. Despite the fact that private entities, frequently the former coal operators, own the remaining sites, the Highlands Conservancy argues that the WVDEP currently controls, or "operates," all the sites and therefore is responsible for obtaining NPDES permits for discharges from those sites.

Unfortunately, neither the CWA nor the Code of Federal Regulations clearly defines who is an "operator." The WVDEP argues that the term refers to the coal operators, that is, the mining companies that originally mined these sites, not to a state entity exercising control over a reclamation site pursuant to a SMCRA bond forfeiture. During oral argument, the Highlands Conservancy asserted that the Court should apply the term's plain meaning and suggested using a dictionary to determine that meaning.

In interpreting statutory language, however, a court should first determine "whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997). In so doing, courts should consider "the language itself, the specific context in which that language is used, and the broader context of

the statute as a whole." <u>Id.</u> at 341.  The "inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" <u>Id.</u> at 340 (<u>quoting</u> <u>U.S. v. Ron Pair Enterprises, Inc.</u>, 489 U.S. 235, 240 (1989)).

Here, the term "operator," as it appears in 40 C.F.R. § 122.21(b), and when read in its statutory context, is sufficiently clear that the Court need look no further.  First, the regulation itself defines "[o]wner or operator" to mean "the owner or operator of any 'facility or activity' subject to regulation under the NPDES program."  40 C.F.R. § 122.2.  The same section defines "facility or activity" as "any NPDES 'point source' or any other facility or activity (including land or appurtenances thereto) that is subject to regulation under the NPDES program." <u>Id.</u>  Although these definitions admittedly are somewhat circular, this Court has already determined that the WVDEP is discharging pollutants from "point sources" at these eighteen sites.  Thus, because the CWA requires any "person" who discharges pollutants from a point source into navigable waters to obtain an NPDES permit, it logically follows that the "point sources" at the eighteen sites at issue are "facilities" operated by the WVDEP.

Moreover, the text of the regulation plainly contemplates that some entity will always be responsible for obtaining an NPDES

permit when discharges requiring a permit are occurring.  Section 122.21(a) states that any "person" discharging pollutants has the duty to obtain an NPDES permit, and "person" specifically includes state agencies and their employees.  Thus, rather than creating an exception to that duty, § 122.21(b) merely clarifies who must actually apply for such permit in situations where multiple "persons," that is, a different owner and operator, are involved. Nothing in subsection (b), or elsewhere in the regulation for that matter, implies a scenario in which there could be no "operator" responsible for the discharges.  Rather, the regulation assumes there will always be both an owner and an operator, and merely provides guidance for those times when, as here, those roles may be filled by different entities.

While both parties agree that an owner other than the WVDEP exists for seventeen of the sites at issue, neither suggests that those owners, whether the original mining companies or other private entities, are responsible for obtaining the NPDES permits. As he must, Huffman concedes that the WVDEP is the entity responsible for managing the bond forfeiture sites and for releasing pollutants into the waterways.

His argument that the WVDEP is not an "operator," and therefore is not required to apply for an NPDES permit, implies an

exception that is not supported by the plain language of the regulation requiring "any person who discharges or proposes to discharge pollutants . . . and who does not have an effective permit . . . [to] submit a complete application" for an NPDES permit. 40 C.F.R. § 122.21(a). Nothing in this regulation suggests a scenario in which no entity is required to apply for an NPDES permit, even though a "person" is discharging pollutants otherwise subject to regulatory oversight under § 122.21(a). In this Court's view, such an outcome contradicts the plain meaning of the regulation and is wholly without support within the CWA and its comprehensive regulatory scheme.

In a section entitled "Information requirements," for example, the regulations require all applicants seeking NPDES permits to provide certain information to the permitting authority. 40 C.F.R. § 122.21(f). Among other things, the applicant must describe the activity requiring the NPDES permit, submit the name and address of the facility for which the permit is being sought, and, importantly, provide "[t]he operator's name, address, telephone number, ownership status, and status as Federal, State, private, public, or other entity." Id. (emphasis added). Clearly, these regulations contemplate the possibility that an "operator" may be

a state entity such as the WVDEP, and, contrary to the WVDEP's assertion, do not limit the term to operators of businesses.

For all these reasons, the Court declines to carve out an exception to the CWA or its regulations based on the WVDEP's caretaker status.  As the "operator" of the sites at issue, the WVDEP is charged with applying for an NPDES permit pursuant to 40 C.F.R. § 122.21.

### D.  No Exception to the NPDES Permitting Requirements

Nor does the CWA or its accompanying regulations create an exception to the NPDES permitting requirements for state entities charged with reclamation duties under SMCRA.  See Mokelumne River, 13 F.3d at 309.  Indeed, as the Highlands Conservancy points out, the EPA has specifically clarified that point source discharges occurring after the release of a SMCRA bond are subject to regulation by NPDES permits.

In 1985, the EPA promulgated amended technology-based effluent guidelines under the CWA to limit post-mining discharges from coal mining operations, and specified that those limitations apply until release of the reclamation bond required by SMCRA.  Coal Mining Point Source Category; Effluent Limitations Guidelines and New Source Performance Standards, 50 Fed. Reg. 41296, 41298 (Oct. 9, 1985).  In response to a public question, it clarified that any

discharges that occur post-bond release are still subject to
regulation.  In a section entitled "Post Mining Discharges," the
EPA stated:

> EPA's coal mining effluent limitations apply until
> release of the reclamation bond required by SMCRA.
> Today's regulation will not change that requirement.
> However, in response to a concern expressed by one of the
> petitioners, the Agency wishes to reemphasize that
> post-bond release discharges are subject to regulation
> under the Clean Water Act. If a point source discharge
> occurs after bond release, then it must be regulated
> through an NPDES permit under sections 301(a) and 402 of
> the Clean Water Act. If the responsible party does not
> obtain a permit, then it is subject to enforcement action
> by EPA under section 309 of the Act and by citizens under
> section 505(a)(1) of the Act. Appropriate case-by-case
> effluent limitations would be established in the NPDES
> permit for such a discharge.

Id. (emphasis added).  Although it was addressing a scenario in
which a SMCRA bond was released, rather than forfeited to the
state, the EPA's intent was clear: Discharges of pollution from
former coal mining sites continue to be subject to regulation by
NPDES permits.

While this Court is mindful that, under West Virginia's SMCRA,
the WVDEP has been charged with the duty of maintaining these sites
and it will be heavily burdened if it must obtain NPDES permits, it
"has no authority to create a permit exception from the CWA for
discharges that would otherwise be subject to the NPDES permitting
process." Northern Plains, 325 F.3d at 1164.  The Supremacy Clause

bars any argument that the WVDEP's compliance with West Virginia's SMCRA laws shields it from the requirements of the federal CWA. See U.S. Const. art. VI, cl. 2; Northern Plains, 325 F.3d at 1165. Thus, this Court holds that the WVDEP is discharging pollutants into navigable waters of the United States from point sources at the eighteen bond forfeiture sites at issue in this case without NPDES permits, in violation of the CWA.

## VI. CONCLUSION

Because the Eleventh Amendment does not bar this citizen suit for prospective injunctive relief, and because no genuine issue of material fact remains in this case, see Fed. R. Civ. P. 56(c), the Court:

(1) **GRANTS** the Highland Conservancy's motion for summary judgment (dkt. no. 28);

(2) **DECLARES** that the WVDEP is violating the NPDES permit requirements of the Clean Water Act; and

(3) **ORDERS** the WVDEP to apply for and obtain NPDES permits for all eighteen sites at issue in this case.

The Court further **DIRECTS** the parties to appear, by telephone, for a status conference to address remaining matters in this case on **Friday, January 16, 2009** at **4:00 p.m.** The Court directs lead counsel for the plaintiff to initiate the conference call and to contact the Court at (304-624-5850). The parties shall provide

34

lead counsel with a number where they may be reached for the conference call by 5:00 p.m. on Thursday, January 15, 2009.

The Court directs the Clerk to transmit copies of this Order to counsel of record.

DATED: January 14, 2009.

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE